# Constitutionality of the Qui Tam Provisions of the False Claims Act

Qui tam suits brought by private parties to enforce the claims of the United States violate the Appointments Clause of the Constitution because qui tam relators are "Officers of the United States" but are not appointed in accordance with the requirements of the Appointments Clause.

Private qui tam actions violate the doctrine of Article III standing because the relator has suffered no personal "injury in fact."

The qui tam provisions of the False Claims Act violate the separation of powers doctrine because they impermissibly infringe on two aspects of the President's authority to execute the laws: the discretion whether to prosecute a claim and the authority to control the conduct of litigation brought to enforce the Government's interests.

Given qui tam's clear conflict with constitutional principles, any argument to sustain the qui tam provisions based upon historical practice must fail.

July 18, 1989

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL*

## I. OVERVIEW AND SUMMARY

*A. The Issue*

The issue presented here is whether the so-called "qui tam" provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 ("Act"), are constitutional. This may well be the most important separation of powers question you will have to address as Attorney General.

In these qui tam provisions, Congress purports to authorize *any* person to prosecute — on behalf of the United States and in the name of the United States — a civil fraud for treble damages and penalties against any person who allegedly makes a false claim to the U.S. government. Unlike normal citizen suits, the qui tam plaintiff — or so-called "relator" — is

---

*Editor's Note: This memorandum was not intended to present the official position of the Department of Justice at the time of its writing, but rather was intended to contribute to a discussion within the Department over what position should be adopted The views on the Appointments Clause expressed in the memorandum have been superseded by a subsequent Office of Legal Counsel memorandum. *See* Memorandum for the General Counsels of the Federal Government from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re. The Constitutional Separation of Powers between the President and Congress* 20-21 n 53 (May 7, 1996) (to be published)

empowered to sue, on the government's behalf, even if he has not sustained any personal injury as a result of the wrongdoer's alleged misconduct. As a bounty for prosecuting the fraud, the relator receives up to thirty percent of any damages and penalties recovered, with the balance paid into the U.S. Treasury. The relator is empowered to prosecute the government's claim even when the Attorney General has determined that there is no valid claim or that pursuing the suit is not in the interests of the United States.

Through qui tam, Congress has attempted to create universal standing to prosecute purely public offenses. These qui tam suits pose a devastating threat to the Executive's constitutional authority and to the doctrine of separation of powers. If qui tam suits are upheld, it would mean Congress will have carte blanche to divest the executive branch of its constitutional authority to enforce the laws and vest that authority in its own corps of private bounty hunters. Simply by attaching a penalty to the violation of any law and by offering a bounty to any person who sues, Congress effectively could "privatize" all civil law enforcement. Indeed, through this device, Congress has authorized each of its own members (as any "person") to enforce the laws directly.

In several qui tam suits currently pending in federal district court, defendant contractors have moved to dismiss, contending that the qui tam mechanism is unconstitutional. Several courts have asked the Department of Justice to express a position. The Office of Legal Counsel, the Civil Division, and the former Office of Legal Policy all agree that the qui tam provisions in the False Claims Act are unconstitutional. We believe they violate the Appointments Clause, infringe on the President's core Article II authority to execute the law, and violate Article III standing doctrine. The Civil Division would like to enter an appropriate case and, either as amicus or by intervention, present the executive branch's arguments against the constitutionality of qui tam. The Solicitor General argues that we should intervene in district court to support the constitutionality of qui tam.

## B. Background

The use of qui tam suits arose in fourteenth century England as an aid to government's primitive law enforcement capabilities. These statutes authorized private "informers" to bring criminal prosecutions for violation of certain penal laws. Upon conviction of the wrongdoer, the private prosecutor was given a share of the penalty as a reward. While some statutes permitted prosecution only by a person who had suffered injury, other statutes authorized "any person," regardless of injury, to prosecute a wrongdoer in the name of the sovereign for violation of a penal law. Initially, these informer actions were brought by criminal indictment or information, but eventually informers could opt to bring their suits as

either a criminal or civil action. This experiment with private law enforcement had an unhappy history of abuse. Qui tam suits fell into disfavor and, from the sixteenth century forward, their use was progressively curtailed.

In the United States, during the emergency of the Civil War, Congress resorted to this archaic device in response to widespread contractor fraud. The False Claims Act of 1863, 12 Stat. 696, authorized any person to prosecute, in the name of the United States, a civil action against a contractor for alleged fraud against the United States. As a reward, the relator received a share of any recovery. After the Civil War, this qui tam statute fell into relative desuetude. By 1986, except for a flurry of activity during World War II, it had become an anachronism.

In 1986, Congress, dissatisfied with the way the executive branch was enforcing government procurement laws, sought to breathe new life into this dormant device. To stimulate private enforcement suits, Congress amended the False Claims Act to provide for treble damages and penalties of up to $10,000 for each false claim, and to provide for a bounty to the relator of up to thirty percent of any recovery (the "1986 Amendments"). The congressional proponents of these amendments made no pretense about the fact that they distrusted the executive's willingness or ability to enforce the law properly, and they stated that their purpose was to "deputize" private citizens to ensure effective law enforcement.

In the two years since enactment of the 1986 Amendments, there has been a massive upsurge in qui tam actions — over 150 suits have been filed. These actions have disrupted the civil and criminal enforcement activities of the Department. *See* Memorandum for the Solicitor General, from Stuart E. Schiffer, Acting Assistant Attorney General, Civil Division (June 15, 1989). They have also undermined the executive's ability to administer complex procurement contracts and, in some cases, have caused serious national security concerns. The 1986 Amendments have also spawned the formation of full-time "bounty hunting" groups — ersatz departments of justice — that go about prosecuting civil fraud actions in the name of the United States.

*C. Qui Tam's Unconstitutionality*

The Office of Legal Counsel believes that the qui tam provisions of the False Claims Act are patently unconstitutional. In our view, this is not even a close question. Our conclusion rests on three grounds.

First, we believe that private qui tam actions violate the Appointments Clause of the Constitution. Art. II, § 2, cl. 2. The Supreme Court has repeatedly held that conducting litigation on behalf of the United States to enforce the rights of the United States must be carried out by an executive branch official or other properly appointed government officer. The Constitution thus does not permit Congress to vest governmental law

209

enforcement authority in self-selected private parties, who have not been injured and who act from mercenary motives, without commitment to the United States' interests and without accountability.

Second, we believe qui tam suits violate Article III standing doctrine. The Supreme Court has repeatedly held that under Article III, a plaintiff is ineligible to invoke federal judicial power unless he can demonstrate that he has suffered "injury in fact" as a result of the defendant's allegedly illegal conduct. Qui tam relators suffer no injury in fact and thus fail to meet this bedrock constitutional requirement. Because Congress may not abrogate this requirement, the False Claims Act's grant of universal standing to *any* person violates Article III.

Third, we believe that qui tam actions violate the doctrine of separation of powers. The Supreme Court has consistently ruled that the authority to enforce the laws is a core power vested in the Executive. The False Claims Act effectively strips this power away from the Executive and vests it in private individuals, depriving the Executive of sufficient supervision and control over the exercise of these sovereign powers. The Act thus impermissibly infringes on the President's authority to ensure faithful execution of the laws.

Until now, no federal court has ever considered or addressed the constitutionality of qui tam actions. Nor, to our knowledge, has any Attorney General ever conceded the constitutionality of the device. Indeed, in 1943, Attorney General Biddle called for its repeal. He contended that it was the duty of the Department of Justice to enforce the laws and that qui tam suits interfered with that responsibility. During these debates in 1943, a leading Senate proponent of qui tam complained:

> [T]he Congress enacted that statute in 1863. I ask any Senator to name one case, from 1863 until 1942, in which the Attorney General of the United States tried to enforce the statute. *From the day the statute went on the statute books to the present, the Attorneys General, whether Democrats or Republicans, fought it.*

89 Cong. Rec. 10,697 (1943) (emphasis added).

*D. Reasons for Opposing Qui Tam*

In my view, the Department of Justice has an obligation to the President and to the Constitution to resist this encroachment on executive power. Consequently, I recommend that the Civil Division be permitted to present the executive branch's arguments against the constitutionality of the qui tam device. I submit that three considerations dictate this course.

First, qui tam poses a potentially devastating threat to the President's constitutional authority. If qui tam is upheld, there would be nothing to

210

prevent Congress from using the device to eviscerate all of the executive branch's civil law enforcement authority. We can expect to see the inexorable extension of qui tam into such areas as securities fraud, savings and loan fraud, and civil rights. Once the facial constitutionality of the device is conceded, there is no principled basis for limiting its future use. As Justice Scalia noted with regard to the independent counsel statute:

> Frequently an issue of this sort will come before the Court clad, so to speak, in sheep's clothing: the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis. But this wolf comes as a wolf.

*Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). The rationale for the special prosecutor statute at least can be restricted to narrow circumstances. Qui tam is far more dangerous: there is simply no way to cage this beast.

Not only would qui tam work a sea change in the balance of power between the Congress and the Executive, but it would, in my view, undermine the liberties of the American people — which is what the doctrine of separation of powers ultimately is designed to safeguard. One of the central tenets of the Framers was that the power to execute the law must be kept in hands that are both independent of the legislature and politically accountable to the people. This enforcement structure was designed to protect the people from the improvident or tyrannical enforcement of the laws. Qui tam allows Congress to circumvent the Executive's check and to have its laws enforced directly by its own private bounty hunters. This destroys the longstanding principle that all three branches must concur before the sovereign may exact public penalties from an individual.

The second consideration that dictates opposing the constitutionality of qui tam is the very force of the arguments against it. Taken together — or taken alone — the three constitutional objections against qui tam are formidable. Indeed, as a matter of principle, they are irresistible. They are by no means extreme arguments. On the contrary, they are — as the Solicitor General would acknowledge — well within the mainstream and firmly rooted in the consistent rulings of the Supreme Court. To date, the Supreme Court has been unyielding in its insistence both upon "injury in fact" as the essential requirement of standing and upon strict compliance with the Appointments Clause whenever significant governmental authority is vested in an individual.

But even if it were a close question — and I do not think that it is — it is not our job, when the President's core constitutional powers are at stake, to "decide" these cases as if we were an Article III judge. We are

the Executive's only advocates, and when the President's core powers are at stake, the Executive's case is so compelling, and the practical consequences of defeat so grave, we have a duty to advance the President's cause. Indeed, the Framers expected that a "great security" against the gradual erosion of the separation of powers was precisely the willingness and disposition of each branch's officers to resist the encroachments of the others: "Ambition must be made to counteract ambition." *The Federalist No. 51*, at 349 (James Madison) (Jacob E. Cooke ed. 1961).

The third consideration that dictates opposing qui tam relates to the posture of these cases. Because of the unusual way these cases arise, we have nothing to lose by challenging the constitutionality of qui tam. The Department of Justice is not a formal party to these cases. Private defendants, ably represented, have directly challenged the constitutionality of the qui tam provisions. The U.S. Senate has filed amicus briefs in support of qui tam. The fundamental powers of the President are thus being decided in our absence. This is not a case in which we have the freedom to pick where or when to fight. This litigation will proceed *with or without* us and will undoubtedly end up in the Supreme Court.

As Madison noted, because of the breadth of the constitutional powers of the legislative branch, that branch easily can "mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments." *The Federalist No. 48*, at 334 (James Madison) (Jacob E. Cooke ed. 1961). Madison therefore found it often to be a "question of real-nicety" whether a particular measure would extend beyond the legislature's sphere. *Id.* Despite the difficulties perceived by the Solicitor General, no such "question of real-nicety" is involved here. If we fail to object to qui tam, it almost certainly will be upheld. If we enter the case and vigorously contest qui tam's constitutionality, we stand a good chance of winning or, at least, obtaining a decision that restricts qui tam. Thus, this is a case in which we will be in no worse position if we go in and lose than we are in right now. In short, there is no "downside" here, and this is precisely the kind of case where we should be aggressively resisting encroachment.

## E. The Solicitor General's Position

The Solicitor General admits that qui tam poses "grave dangers" to the Presidency. *See* Memorandum for the Solicitor General, from Richard G. Taranto, Assistant to the Solicitor General at 3, 10-11 (June 26, 1989) ("Taranto Memo"). He appears to perceive the issue of qui tam's constitutionality as a "close" one. *See id.* at 3. Nevertheless, he is recommending that the Department intervene in district court to *support* the facial constitutionality of the qui tam statute. The Solicitor General's position would require the surrender at the outset of the two strongest arguments against qui tam — the Appointments Clause and Article III standing arguments.

212

The Solicitor General assures us, however, that he will reserve the right to use a separation of powers balancing test to defend against encroachment if qui tam is unconstitutionally applied in the future. *Id.* at 12-14.

To uphold qui tam, the Solicitor General is prepared to disregard decades of clear Supreme Court jurisprudence and the application of well-settled constitutional principles. His sole reason for embracing qui tam is its historical usage. *Id.* at 4-5. This argument — that past usage alone is enough to establish a practice's constitutionality — is untenable both as a matter of history and of law. Moreover, the Solicitor General's proposed strategy of preemptive concession makes no sense as a litigation tactic.

The Solicitor General vastly overstates the historical acceptance of qui tam. Prior to passage of the False Claims Act, the only significant use of qui tam occurred in the Federalist period, during which time it appears that perhaps six statutes were enacted that may have authorized penalty actions by private persons. These statutes involved relatively arcane areas; one set fines for illegally trading with the Indians, another set fines for misconduct by census-takers. The record, however, is most unclear as to whether these statutes reflected *any* appreciable acceptance of qui tam actions by persons who had sustained no injury. It appears from actual practice that with very few exceptions, suits under these statutes were brought either by government officials (for whom the moiety was compensation) or by persons who had suffered injury in fact. There is little evidence that the long-accepted historical practice on which the Solicitor General relies ever existed.

It is easy to understand why qui tam has been so marginal a practice in the history of federal law. Adopted when the Executive was embryonic, the early qui tam statutes were essentially stop-gap measures, confined to narrow circumstances in which the government lacked the institutions to enforce the law. The intent of those statutes was to assist a fledgling executive, not supplant it. As the Executive's law enforcement capabilities gathered strength, qui tam rapidly fell into disuse. A fair reading of the history of qui tam in the United States reveals it as a transitory and aberrational device that never gained a secure foothold within our constitutional structure because of its fundamental incompatibility with that structure.

Moreover, even strong historical support for qui tam could not cure the practice's constitutional infirmities. No Supreme Court case has ever given history the kind of dispositive weight that the Solicitor General would here. On the contrary, the Supreme Court has repeatedly stated that history alone can never validate a practice that is contrary to constitutional principle, even when the practice "covers our entire national existence and indeed predates it." *Walz v. Tax Commission*, 397 U.S. 664, 678 (1970). *Accord Marsh v. Chambers*, 463 U.S. 783, 790 (1983). There are numerous examples of statutes passed by the early congresses that have been held unconstitutional or clearly would be held unconstitution-

al today. *See infra* p. 233. Thus, if a past practice cannot be reconciled with constitutional principle, an appeal to history alone cannot sustain it. In the case of qui tam, absent the invocation of history there is no question about the practice's unconstitutionality.

Although history alone cannot validate a plainly unconstitutional practice, the Supreme Court has indicated that close cases will be resolved in favor of the constitutionality of certain strong historical traditions. The Court weighs several factors in determining the authority of a tradition, including (1) whether there is evidence that the Framers actually considered the constitutional implications of their actions; (2) whether the practice is so longstanding and pervasive that it has become "part of the fabric of our society;" and (3) whether the practice can be accommodated within the constitutional framework in a way that does not undermine settled principles. *See, e.g., Young v. United States ex rel. Vuitton et Fils,* 487 U.S. 787 (1987); *Marsh v. Chambers; Walz v. Tax Commission.*

Qui tam would deserve no deference under these criteria. There is no evidence that the Framers considered the constitutional status of qui tam. On the contrary, the early statutes are the kind to which the Court gives no weight — "action ... taken thoughtlessly, by force of long tradition and without regard to the problems posed." *Marsh v. Chambers,* 463 U.S. at 791. Nor can it seriously be maintained that qui tam is "part of the fabric of our society." Never more than a marginal device, it is today an anachronism that easily can be excised without disruption. Qui tam's principle of private law enforcement, however, is so fundamentally incompatible with established doctrines of standing and separation of powers that, if accepted, it would substantially undermine these doctrines. Thus, qui tam is not merely an innocuous historical oddity that can be narrowly accommodated, but is, by nature, an exception that will consume the rule.

Further, the Solicitor General's use of history is internally inconsistent. None of the old qui tam statutes upon which the Solicitor General relies allowed the Attorney General to intervene once the relator brought the case. However, the Solicitor General concludes that the current statute will be unconstitutional if it is applied to limit the Attorney General's participation in the suit. It is difficult to understand how the Solicitor General can give dispositive historical weight to statutes that would be unconstitutional under his theory for arguing qui tam's validity.

Finally, as a tactical matter, the Solicitor General's strategy of preemptive concession is extremely unwise. It voluntarily surrenders at the outset the two strongest objective arguments against qui tam. Once those are abandoned, all that will remain to protect the President's interests will be a subjective balancing approach and the argument that at some undefined point the degree of encroachment will become unbearable. This approach leaves executive powers entirely vulnerable to an adverse judicial decision.

## II. THE STATUTE AND ITS IMPACT

*A. The Statute*

The False Claims Act provides that anyone who presents a false money claim to the Federal Government shall be liable for double or treble damages and civil penalties of up to $10,000 per false claim. 31 U.S.C. § 3729. Under the qui tam provisions of the Act, any person may bring a civil action "for the person and for the United States Government" to recover damages and penalties. *Id.* § 3730(b)(1). The qui tam action, although initiated by a private person called a relator, is "brought in the name of the Government." *Id.*

The details of the qui tam mechanism demonstrate that the real party in interest is the United States, with the relator functioning as attorney for the United States. When a private person brings a qui tam action, he must serve on the Government the complaint and a written disclosure of the information he possesses. *Id.* § 3730(b)(2). The Attorney General is then forced to decide, within 60 days, whether to "intervene and proceed with the action." *Id.* By the end of that period, the Attorney General must inform the court whether the government shall proceed; if not, "the person bringing the action shall have the right to conduct the action." *Id.* § 3730(b)(4)(B).

Where the Attorney General decides not to proceed with the case, the relator alone represents the government. He has full control over the litigation, including discovery, admissions, and presentation of evidence, subject only to a few specific limitations.[1] If the relator prevails, most of the recovery is paid into the Treasury, with the relator keeping between twenty-five and thrity percent as his reward. *Id.* § 3730(d)(2). The relator is also entitled to attorneys' fees. *Id.*

If the Attorney General initially declines to proceed with the case, he may intervene later only upon a showing of "good cause," but such intervention does not limit "the status and rights of the person initiating the action." *Id.* § 3730(c)(3). Thus, the relator retains primary control over the case despite the government's intervention. Moreover, the legislative history to the 1986 Amendments expressly states that any judgment or settlement in a case conducted exclusively by the relator binds the Government under principles of preclusion. S. Rep. No. 345, 99th Cong.,

---

[1] A qui tam action may be dismissed only if the court and the Attorney General give written consent. 31 U.S.C. § 3730(b)(1) If the Government shows that discovery by the relator would interfere with ongoing civil or criminal investigations or prosecutions, the court may stay discovery for a period not to exceed 60 days The court may impose further stays if the Attorney General shows "that the Government has pursued the criminal or civil investigation or proceedings with reasonable diligence and any proposed discovery in the [qui tam] action will interfere with the ongoing criminal or civil investigation or proceedings " *Id* § 3730(c)(4). The relator is under no general constraint to pursue Department of Justice litigation policies or procedures.

2d Sess. 27 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5292. This stands to reason: since the relator's action is in the name of the United States, the relator seeks a share of damages inflicted on the United States, and any recovery (minus the relator's moiety) is paid into the Treasury.

In cases in which the Attorney General does enter within the initial sixty-day period, the government has "primary responsibility for prosecuting the action." 31 U.S.C. § 3730(c)(1). The relator nevertheless has "the right to continue as a party to the action." *Id.* This participation right gives the relator a substantial role in the litigation. The relator has the right to a hearing if the Attorney General decides to dismiss the action. *Id.* § 3730(c)(2)(A). If the Attorney General proposes to settle the case but the relator objects, the settlement may go forward only if "the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances." *Id.* § 3730(c)(2)(B). In addition, the relator participates fully at trial, calling witnesses, cross-examining witnesses, and testifying, except that on the government's motion "the court may, in its discretion, impose limitations on the [relator's] participation." *Id.* § 3730(c)(2)(C).

In cases primarily conducted by the Attorney General, the relator receives between 15 and 25 percent of the proceeds, plus reasonable expenses (including attorneys' fees), as determined by the court. *Id.* § 3730(d)(1). Moreover, if the Government decides to pursue its claim in some forum other than a False Claims Act suit — such as an administrative penalty action — the relator has the same rights in that proceeding that he would have in court. *Id.* § 3730(c)(5).

In short, where the Government decides not to join, the relator conducts the suit as if he were the Attorney General, except that unlike the Attorney General he takes no oath of office, he bears no loyalty to the Government or continuing responsibility for implementing its policies, and he receives up to thirty percent of the suit's proceeds. If the Government enters the suit, the relator continues to represent the United States, subject to the court's (not the Attorney General's) control. This arrangement carries out the purpose that underlay the 1986 Amendments. Congress's "overall intent in amending the qui tam section of the False Claims Act is to encourage more private enforcement suits." S. Rep. No. 345 at 23-24. In order to do that, Congress decided to "deputize ready and able people ... to play an active and constructive role through their counsel to bring to justice those contractors who overcharge the government." 132 Cong. Rec. 29,322 (1986).

## B. The Statute's Impact

The heart of the statute's impact derives from the fact that the qui tam provisions interfere with the Attorney General's discretion whether to initiate a suit under the False Claims Act. That interference adversely

216

affects both the Government's law enforcement powers and its contracting powers.

## 1. The Government's Enforcement Role

a. *The decision to initiate litigation.* First and most obviously, the qui tam mechanism removes from the Department's hands the decision whether and when to commence an action. Once a relator files his complaint, we have 60 days within which to decide whether to join. This is true even if we are pursuing an investigation that is far from ready for decision whether to prosecute.[2] In several cases, district courts already have refused to grant us extensions in order to avoid interference with ongoing criminal investigations. *See, e.g., United States ex rel. McCoy v. California Medical Review Inc.,* 723 F. Supp. 1363 (N.D. Cal. 1989).[3] If a stay is unavailable, the civil case proceeds with or without us, sometimes alerting targets of criminal investigations; sometimes resulting in disclosure of key information in our possession, including our litigating positions; and sometimes complicating attempts to prepare a comprehensive plea arrangement and civil settlement.

In addition, informal avenues of redress and adjustment can be cut off. Instead, the Government may be forced to choose quickly between leaving the suit wholly to the relator or taking the very serious step of charging fraud against a private person.[4] Such a charge is a serious matter, whether brought by the Department or a relator. In many cases prosecutorial discretion would counsel against our bringing a False Claims Act suit; for example, we might find that although a contractor was technically liable, it has fired the employees responsible for the fraud. A relator, however, is interested only in money, not in the faithful execution of the laws. He has taken no oath of office, has no obligation of loyalty to the Government or its interests, and has no continuing responsibility for the governmental programs at issue. Rather, he holds a personal financial stake that in all other contexts would disqualify him from representing the Government's interests.

*United States ex rel. Hyatt v. Northrop Corp.,* No. CV 87-6892 KN (Jrx), 1989 U.S. Dist. LEXIS 18940 (C.D. Cal. Dec. 27, 1989), provides an

---

[2] Contrary to our experience, the Senate Committee believed that "with the vast majority of cases, 60 days is an adequate amount of time to allow Government coordination, review and decision" of fraud actions running into millions or billions of dollars. S Rep No. 345 at 24-25.

[3] This accords with the legislative history, which states that "the Committee does not intend that criminal investigations be considered an automatic bar to proceeding with a civil fraud suit." S. Rep No 345 at 25. Instead, the Senate Committee stated that if the Government obtains an initial stay, "the court should carefully scrutinize any additional Government requests for extensions by evaluating the Government's progress with its criminal inquiry." *Id*

[4] In some circumstances, we may be considering enforcement action less draconian than a treble-damages-plus-penalties action under the False Claims Act. Once a relator has ensured that there will be a treble-damages action, however, we may be forced either to scrap a single-damage suit or attempt to handle it in conjunction with the other.

example of a case in which the qui tam provisions have allowed a relator to force a suit that this Department would not have pursued. In that case, eight employees are suing Northrop for alleged fraud in the manufacture of inertial measurement units ("IMUs") for the MX (Peacekeeper) Missile. They seek restitution of $1 billion, $250 million in compensatory damages, and $5 million in punitive damages. Two of the eight relators had filed an earlier qui tam action against Northrop that was dismissed because the information on which it was based was already in the Government's possession. The pending suit makes numerous allegations of fraud, including that Northrop knowingly delivered defective IMUs to the Air Force, that it failed to test or inspect all components properly, and that it misrepresented the performance of operation audits and responsive corrective action. In fact, the Civil Division's memorandum reviewing the relators' suit notes that the complaint is so broad that it encompasses nearly every action undertaken by Northrop in the course of the manufacture and delivery of the IMUs.[5] The Civil Division declined to enter the relators' action because extensive investigations of Northrop's operations by the U.S. Attorney and the Air Force failed to produce evidence of fraud. *See* Civil Division Memo at 8-15. Moreover, the Air Force's records show that the actual performance of the allegedly defective IMUs has far exceeded expectations, thus rebutting the relators' claims of fraud. *See id.* at 12. Nevertheless, the relators are permitted by the qui tam provisions to continue to pursue their suit on behalf of the Government to satisfy their personal purposes, whether for harassment or in hopes of forcing Northrop to pay them a settlement award.

b. *The conduct of litigation.* When we do enter a case, the relator retains his rights to participate, which often are exercised in ways adverse to the government's interests. The Civil Division has already encountered claims by relators that they, as representatives of the United States, are entitled access to our investigative files and personnel. Moreover, all disputes between us and the relator over the conduct of the case — from discovery to witness selection to cross-examination — are decided by the court. This leaves open the question whether the Act has transferred the executive power to the relator or the district judge, but it is clear that that power has been transferred away from the Attorney General.[6]

When we do not intervene, the Department nevertheless must spend resources monitoring cases that it had for good reason decided not to bring. Because it is never possible to tell what prejudice we might suffer

---

[5] *See* Memorandum for John R. Bolton, Assistant Attorney General, Civil Division, from Michael F Hertz, Director, Commercial Litigation Branch, at 7 (the "Civil Division Memo"), recommending that the Department decline to enter the relators' suit.

[6] This arrangement, by which the relator looks over our shoulder at trial, is precisely what Congress intended. At trial, the relator is to act as "a check that the Government does not neglect evidence, cause undue delay, or drop the false claims case without legitimate reason " S Rep No 345 at 26

from a relator's conduct, we must keep close track of these cases. Other difficulties will also arise; for example, the Civil Division has informed us that in one case a qui tam relator sought to depose a government investigator who had worked on a grand jury probe of a contractor other than the qui tam defendant.

c. *Judgment and settlement.* Perhaps the most important interference comes if we seek to settle a case. If we negotiate a settlement but the relator objects, the *court* must determine whether the arrangement is "fair, adequate and just" under the circumstances — a judicial role that to our knowledge is unique.[7] The perverse results this provision can have are reflected in the court's action in *Gravitt v. General Electric Co.*, 680 F. Supp. 1162 (S.D. Ohio), *cert. denied*, 488 U.S. 901 (1988). In that case, a relator claimed that General Electric had presented false statements to the Defense Department. Many of General Electric's records were indeed incorrect, but the inaccurate accounting system involved had resulted in net *undercharges* to the Government. We negotiated a settlement under which General Electric would pay a substantial penalty and waive its counterclaims growing out of the undercharges. The relator objected, and the district court refused to accept the settlement, lecturing us on the inadequacy of our investigation into the matter, even though the Defense Department was already quite familiar with the situation.[8] A few years later, we succeeded in settling for the original figure.

Where we do not enter a qui tam action, the relator either litigates the case to judgment, which binds the United States, S. Rep. No. 345 at 27, or settles it, likewise binding the Government. This may be quite significant. For one thing, a qui tam relator, who has no enforcement interest, may allege far more corruption than he can prove. Even if that corruption were real, if the relator could not prove it, a judgment against him on those issues would bar us from acting later. In addition, relators such as discharged employees may bring a qui tam count in conjunction with private causes of action. To settle the private claims, the relator may have an incentive to trade the qui tam elements, since he receives only a frac-

---

[7] Even the Tunney Act, 15 U.S.C. § 16(e), which subjects antitrust *consent decrees* to judicial review as to the public interest, does not apply to settlements, which heretofore were entirely outside the court's jurisdiction There are very serious doubts as to the constitutionality even of the Tunney Act it intrudes into the executive power and requires the courts to decide upon the public interest — that is, to exercise a policy discretion normally reserved to the political branches Three Justices of the Supreme Court questioned the constitutionality of the Tunney Act in *Maryland v. United States*, 460 U.S 1001 (1983) (Rehnquist, J , joined by Burger, C.J., and White, J , dissenting).

[8] In *United States ex rel Stillwell v Hughes Helicopters, Inc* , 714 F. Supp. 1084 (C D Cal 1989), the defendant argued that the qui tam mechanism was unconstitutional on its face and pointed to the district court's conduct in *Gravitt* as an example of an illicit transfer of authority to the courts. The judge in *Stillwell*, in upholding the qui tam provisions (which he presumed to be constitutional, since they had not been challenged by the executive branch), replied that the *Gravitt* court's views of our conduct were entirely reasonable *Id.* at 1092-93 n.8. This may indicate that in some qui tam cases the courts will not need to second-guess our decision to settle, because they will be able to dispose of the issue by second-guessing our investigative zeal

tion of any payment attributed to them. We must therefore carefully review every qui tam settlement and, if it is defective, try to persuade the judge to reject it.

Moreover, the collateral effects may go beyond barring further False Claims Act litigation. In *United States v. Halper*, 490 U.S. 435 (1989), the Supreme Court held that civil penalties under the False Claims Act can represent punishment for purposes of the Double Jeopardy Clause. The Court specifically left open the question whether a qui tam suit qualifies as a suit by the Government for these purposes. *Id.* at 451 n.11. If it does, we may be foreclosed by the relator from bringing subsequent criminal prosecutions.[9]

## 2. The Government as Contractor

Transfer of control over the Government's litigation to private persons affects not only our litigation function, but every aspect of the Government's work that can be implicated in a suit under the False Claims Act. Any Government contract can give rise to a False Claims Act action. For that reason, every routine decision that an agency makes as a contracting party is now subject to the relator's influence.

Any complex contract naturally will produce issues of construction between the parties. In the case of Government contracts, the agency concerned must decide whether contract deviations constitute a breach, and sometimes whether a breach amounts to fraud. In making these decisions, it is frequently in the Government's interest, as it would be in the interest of any contracting party, to avoid excessive concern over minor failings that might threaten a useful course of dealing with the other party. In the Government's case, especially, the agency must carefully consider such matters where the contract involves important military or national security matters, particularly if there are a limited number of qualified contractors, or the contractor's performance otherwise has been adequate or even excellent.

Under the 1986 Amendments, however, all such policy decisions potentially are thrown into the public forum. Relators who have no interest in the smooth execution of the Government's work have a strong dollar stake in alleging fraud whether or not it exists. The possibility of a qui tam suit will therefore lead to a hardening of positions by the Government and the contractor: the contractor must be certain not to be too candid, while the Government must be scrupulous about even its least significant rights, in order to avoid later second-guessing by a relator and a court. The ripple effects of qui tam in the Government's contracting flexibility thus could be enormous.

---

[9] There will also be the nice question of when jeopardy attaches in a False Claims Act suit

## III. QUI TAM SUITS ARE UNCONSTITUTIONAL

*A. Appointments Clause Violation*

We believe that qui tam suits brought by private parties to enforce the claims of the United States plainly violate the Appointments Clause of the Constitution. Art. II, § 2, cl. 2. The Supreme Court has made clear that exercises of significant governmental power must be carried out by "Officers of the United States," duly appointed under the Appointments Clause. *E.g., Morrison v. Olson*, 487 U.S. 654, 670-77 (1988); *Buckley v. Valeo*, 424 U.S. 1 (1976). It is well established that "conducting civil litigation in the courts of the United States for vindicating public rights" is at the core of executive power and "may be discharged *only* by persons who are 'Officers of the United States.'" *Id.* at 140 (emphasis added). *See also United States v. San Jacinto Tin Co.*, 125 U.S. 273, 279 (1888) (the Attorney General "is undoubtedly the officer who has charge of the institution and conduct of the pleas of the United States, and of the litigation which is necessary to establish the rights of the government"); *Confiscation Cases*, 74 U.S. (7 Wall.) 454, 458-59 (1868) ("[S]o far as the interests of the United States are concerned, [all suits] are subject to the direction, and within the control of, the Attorney-General.").

The Supreme Court has, to date, steadfastly adhered to the requirements of the Appointments Clause. *See Public Citizen v. Department of Justice*, 491 U.S. 440, 482-89 (1989) (Kennedy, J., concurring) (Appointments Clause must be strictly applied; no "balancing" where a power has been committed to a particular Branch of the Government in the text of the Constitution). Even in *Morrison v. Olson*, the Court insisted on strict compliance with the Clause's terms, upholding the use of special prosecutors only after concluding that (i) the prosecutors were "inferior" officers, (ii) they were duly appointed by a "Court of Law" in accordance with the Appointments Clause, and (iii) they remained subject to sufficient executive control in the initiation and prosecution of cases.

In *Buckley*, the Court held that Congress violated the Constitution when it attempted to vest civil litigation authority in a commission whose members had not been duly appointed under the Appointments Clause. The Court said that "[a] lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" 424 U.S. at 138. The qui tam provisions in the False Claims Act are equally unconstitutional. Qui tam relators are not appointed in any of the ways prescribed by the Appointments Clause and hold no commission under the United States. Yet these relators exercise significant governmental authority by suing to enforce the rights of the United States in the name of the United States. Just as Congress cannot vest litigation authority in commission members who have not been duly

221

appointed, it cannot vest such litigation authority in self- selected private bounty hunters who operate without accountability and without commitment to the United States' interests.

There can be no doubt that qui tam relators are exercising significant governmental power. Private relators are empowered to level fraud charges against other private citizens and hail them into court to answer for these alleged public offenses, with the possibility of collecting not only damages but substantial civil penalties. In so doing, the relators are empowered to overrule the judgment of executive officials as to whether the contractor has, in fact, committed fraud and whether it is appropriate under the circumstances to prosecute the Government's claim. Where the Attorney General determines not to proceed with a suit, the relator is empowered to prosecute the suit in the Government's name, controlling all aspects of the litigation and binding the United States by the judgment. If the Attorney General later decides to intervene, the relator remains in control. Even if the Attorney General enters the suit at the outset, the relator remains a party and is empowered to challenge not only the litigation judgments of the Government but also any attempt to dismiss or settle the case.

It is also beyond dispute that the claim the relator litigates is that of the United States. Qui tam relators historically were understood to be suing in a representative capacity. They were viewed as standing in the shoes of the Government and suing on behalf of the Government to enforce the rights of the Government. Note, *The History and Development of Qui Tam*, 1972 Wash. U.L.Q. 81, 83-84 ("Washington University Note"). The qui tam provisions in the False Claims Act are based precisely on that premise. The Act provides that one who files a false claim "is liable *to the United States Government* for a civil penalty ..., plus 3 times the amount of damages which the *Government* sustains." 31 U.S.C. § 3729(a) (emphasis added). In authorizing qui tam suits, the Act provides that the suit shall be brought *"for the United States Government"* and *"in the name of the Government." Id.* § 3730(b)(1) (emphasis added).

The history of the False Claims Act demonstrates that the Act has always been understood to be what it seems to be: an authorization for private persons to bring suits on behalf of the Government. Speaking in support of the Act when it was adopted, Senator Howard explained that it was necessary to deal "speedy and exemplary justice" to "the knave and the rogue" who committed war fraud against "the Government, who is the real sufferer in all cases." S. Rep. No. 291, 78th Cong., 1st Sess. (1943) (quoting 1863 debates).

Similarly, the discussions in 1943, when Congress considered eliminating the qui tam action altogether, leave no doubt as to the nature of a qui tam action. Speaking in defense of the mechanism, Senator Murray, after complaining about the Department of Justice's failure to prosecute antitrust cases, said that "if a fraud has been perpetrated ... and the Attorney

222

General is failing to take advantage of [evidence of it], *any private citizen in the United States should be entitled to bring up the case in court.*" 89 Cong. Rec. 7575 (1943) (emphasis added). In a like vein, Senator Revercomb asked, "[w]hat harm can be done by saying to the Department of Justice, 'If you do not perform your duty some citizen of this country is going to rise and perform it for you?' " 89 Cong. Rec. 7598 (1943).

The 1986 debates reflect the same understanding. Speaking in the House, Representative Brooks gave a straightforward explanation of qui tam: "The False Claims Act contains provisions which allow citizens to bring suits for false claims on behalf of the Government." 132 Cong. Rec. 22,336 (1986). Representative Bedell described the statute as giving informers "standing to bring suit ... on behalf of the Government." 132 Cong. Rec. 22,340 (1986). Senator Grassley, the main force in the Senate behind the 1986 Amendments, explained that the "False Claims Act allows an individual knowing of fraud[] ... to bring suit on behalf of the government ...." 131 Cong. Rec. 22,322 (1985). In perhaps the most telling description, Representative Berman, one of the bill's principal drafters, offered the following statement: "[T]his is precisely what this law is intended to do: deputize ready and [willing] people ... to bring to justice those contractors who overcharge the government." 132 Cong. Rec. 29,322 (1986).

Indeed, the Solicitor General appears to concede that the qui tam device violates the Appointments Clause to the extent a qui tam relator is suing in a representative capacity. Taranto Memo at 8. To surmount this constitutional barrier, the Solicitor General argues that a qui tam action is not a suit based on the government's claim but is really a private suit based on the relator's private cause of action for the contingent monetary award Congress offered for successfully litigating the suit. The Solicitor General thus would argue that, when the relator prosecutes a case, he is not exercising governmental authority, but merely litigating his own private claim. The Solicitor General suggests an analogy to private antitrust actions or private title VII actions where both the private party and the government can bring substantially identical suits. *Id.*

This argument is untenable because it flatly contradicts the history of qui tam actions, the language and structure of the False Claims Act, and the Act's legislative history. All of these sources make abundantly clear that the relator is suing in a representative capacity to enforce the claim of the United States and that his statutory award is not relief for injury suffered, but a reward for his services. *See supra* pp. 215, 222-23.

In antitrust and title VII actions, the private plaintiff alleges that the defendant's conduct has invaded his personal legal rights, causing *him* direct injury. The title VII plaintiff claims that he has been personally harmed by discriminatory practices. The antitrust plaintiff claims that he has been economically harmed by a price-fixer's illegal conduct. Such private plaintiffs have their own independent causes of action to redress

223

these invasions of their rights, which incidentally vindicate the public interest. Under the False Claims Act, however, the government is the only party who has suffered injury as a result of the contractor's alleged fraud. Thus, the relator's suit under the False Claims Act vindicates the injury to the government and that injury alone.

It is clear that the real party in interest represented by the relator is the government, because the relator's suit binds the United States by res judicata.[10] Even when the Attorney General does not participate in the suit, any judgment or settlement obtained by the relator has preclusive effect on the United States. In this respect, qui tam actions differ fundamentally from the private lawsuits cited by the Solicitor General, and indeed from all "private attorneys general" suits. These private actions do not bind the United States because the real plaintiff is the individual suing on his own independent claim. *See, e.g., Sam Fox Publishing Co. v. United States*, 366 U.S. 683, 690 (1961) ("the Government is not bound by private antitrust litigation to which it is a stranger"). In a qui tam action, however, the relator is not really acting in a private capacity, but rather is standing in the government's shoes and is prosecuting the United States' claim.

The Solicitor General's argument that the relator is merely prosecuting his own private claim ultimately fails because it runs headlong into an Article III standing problem. As discussed below, the relator, especially when suing only in his personal capacity, has no "case or controversy" to present to the court because he can show no "injury in fact" as a result of the contractor's alleged fraud.

## B. Article III Standing

Private qui tam actions violate the well-settled doctrine of Article III standing. The keystone of this modern standing doctrine, which has been carefully refined by the Supreme Court over the past 20 years, is the constitutional requirement of "injury in fact." The Supreme Court has repeatedly held that, at an "irreducible minimum," Article III requires a plaintiff in federal court to demonstrate that:

(1) he *personally* has suffered some actual or threatened injury;
(2) the injury was *caused* by the putatively illegal conduct of the defendant; and
(3) the relief sought likely will *redress* the injury.

*E.g., Valley Forge Christian Colleqe v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 482-83 (1982); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979); *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 41 (1976).

---

[10] *See supra* p. 215-16.

A plaintiff cannot rely solely on abstract injury or generalized grievances shared by all citizens and taxpayers to establish standing. *Allen v. Wright*, 468 U.S. 737, 754 (1984); *Valley Forge*, 454 U.S. at 482-83. If the plaintiff himself has not suffered particularized harm that is "distinct and palpable," *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974), there is no case or controversy under Article III. *See, e.g., Warth v. Seldin*, 422 U.S. 490 (1975); *Sierra Club v. Morton*, 405 U.S. 727 (1972). Under these well-established principles, qui tam suits are plainly unconstitutional to the extent they purport to be private actions because the relator has suffered no personal "injury in fact" as a result of the contractor's alleged fraud.

The Solicitor General argues that the relator's prospect of receiving a bounty is enough to satisfy Article III standing requirements. It is clear, however, that the mere expectation of a reward cannot be characterized under established Supreme Court precedent as an "injury" of any kind.[11] The only party who suffers injury as a result of the contractor's false claims is the government. The relator simply seeks to stand in the government's shoes to sue for an invasion of the government's rights. The monetary payment he seeks is not judicial relief to redress his injury, but a reward for bringing the case. Mere financial incentive to bring the suit does not satisfy the constitutional standard.

The Supreme Court has expressly rejected this argument in *Diamond v. Charles*, 476 U.S. 54 (1986). There, a physician argued that he had standing to continue defending an abortion statute because the trial court had already awarded attorneys' fees against him. Only he was left to defend the statute, and only by vindicating the statute could he avoid paying the fees. Although the Court recognized that the physician had a financial stake in the outcome of the litigation, it held that financial interest alone is not sufficient to confer standing. *Id.* at 69-70. Citing Valley Forge to stress that the plaintiff's injury must be a "result of the putatively illegal conduct," the Court stated that "Art. III standing requires an injury with a nexus to the substantive character" of the underlying claim; an interest that is merely "a byproduct of the suit" is not sufficient. *Id.* at 70-71. Just as an attorney with a contingency fee arrangement does not

---

[11] This view is supported by two Supreme Court cases holding that an informer's prospective interest in his reward does not give him a judicially cognizable interest sufficient to allow him to intervene in a case being prosecuted by the government In both cases, the statute at issue gave the informer a share of the proceeds of the government's recovery, but did not authorize direct suit by the informer In *United States v. Morris*, 23 U S (10 Wheat ) 246 (1825), the Court ruled that customs officers who had a right to a share of forfeited property as a reward had no right to intervene in the forfeiture proceeding to prevent the United States from remitting the property to the owner The Court ruled that

[t]he forfeiture is to the United States, and must be sued for in the name of the United States.
. In all this, [the collector] acts as [an] agent of the government, and subject to the authority of the secretary of the treasury, who may direct the prosecution to cease . [T]he right [of the customs officer] does not become fixed, until the receipt of the money by the collector

Id. at 290 *Accord Confiscation Cases*, 74 U S. (7 Wall ) 454 (1868) (following *Morris*).

225

have standing on his own to pursue his client's claim, the relator does not have standing to pursue his claim for a share of the False Claims Act damages. The monetary recovery must be directed at redressing an injury suffered by the plaintiff as the result of the invasion of a substantive legal right. As the Assistant to the Solicitor General observes, *Diamond v. Charles* is consistent with:

> case or controversy law generally [which] requires that there be a legal dispute — and that the plaintiff have a claim of legal right and the defendant an alleged legal duty to the plaintiff — that precedes and is independent of the lawsuit itself.

Taranto Memo at 4.

Nor does the fact that Congress has specifically authorized uninjured persons to bring qui tam actions in any way cure the Article III deficiency. Congress is bound by Article III's "case or controversy" restriction on judicial power and cannot abolish the constitutional requirement of "injury in fact." Congress cannot confer standing on persons who fail to meet that test.

Congress can, of course, enact statutes creating new substantive legal rights, the invasion of which can give rise to the kind of particularized injury necessary to create standing. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973). In no event, however, "may Congress abrogate the Art. III minima: plaintiff must always have suffered 'a distinct and palpable injury to himself'... that is likely to be redressed if the requested relief is granted." *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. at 100. In enacting the qui tam provisions of the False Claims Act, however, Congress has not created any substantive legal right for qui tam plaintiffs the invasion of which creates Article III injury. Those qui tam provisions simply permit the relator to sue on behalf of the United States, whose substantive rights *have* been genuinely invaded. As the words of the statute make clear, a qui tam suit is an action brought to recover "damages which the *Government* sustains because of the [contractor's fraudulent] act." 31 U.S.C. § 3729(a) (emphasis added).

Qui tam suits thus differ fundamentally from "private attorneys general" suits or citizens' suit provisions in other statutes. The Supreme Court has strictly adhered to the "injury in fact" requirement in interpreting those statutes, holding that only those who can demonstrate their own personal injury from the claimed illegal conduct are allowed standing to sue to protect the public interest in conjunction with their own. *See. e.g., Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 16 (1981); *Sierra Club v. Morton*, 405 U.S. at 737 ("[I]njury is what gives a person standing to seek judicial review ..., but once review is properly invoked, that person may argue the public interest in support of

his claim.... It is in [this] sense that we have used the phrase 'private attorney general.'"). Qui tam suits also differ from those cases in which the Supreme Court has permitted litigants to raise the rights of others under so-called jus tertii or "third party" standing. In those cases, the Court has strictly adhered to the "injury in fact" requirement, allowing a plaintiff to assert the rights of third parties *only* if the plaintiff showed that the challenged action also injured him. *See Craig v. Boren*, 429 U.S. 190, 192-97 (1976); Charles A. Wright, *The Law of Federal Courts* 72 (4th ed. 1983).

Significantly, the Solicitor General's own office cannot agree on whether the mere prospect of a bounty is sufficient to create standing. The Deputy Solicitor "counsel[s] against" making such an argument because: (1) "it cannot be reconciled with recent Supreme Court decisions"; (2) it cannot "account for the requirement of redressability which the Court has stressed in recent decisions"; and (3) it "would be in some tension with our usual posture [in standing cases], which has generally been to insist on a formalistic, corrective-justice type model of standing." Memorandum for the Acting Solicitor General, from Thomas Merrill, Deputy Solicitor General at 3 (Apr. 5, 1989). The Assistant to the Solicitor General admits that the standing issue is "close" and "the hardest question" and that the bounty theory "stands in uneasy relation to prevailing principles of standing." Taranto Memo at 3 n.1.

To surmount qui tam's obvious conflict with established standing doctrine, the Solicitor General proposes to argue that qui tam actions must be recognized as "cases or controversies" within the meaning of Article III because they were known in England prior to the Revolution and seem to have been used to a limited degree in the early years of the Republic. This historical argument is fundamentally flawed in several respects.[12]

First, the status of historical qui tam actions as cases or controversies is irrelevant to the validity of the Solicitor General's proposed reformulation of qui tam as a truly private suit by the relator. Qui tam as it existed at the time of the framing involved actions in which the relator sued in a representative capacity to enforce a public penalty on behalf of the government. *See, e.g.*, Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. at 102 (authorizing informers to collect penalties for official misconduct under Census Act). Although it may have violated separation of powers, such an action at least presented a case or controversy because the real party in interest — the government — had suffered an injury and thus had a cognizable claim. But it is mere sleight-of-hand to suggest that if qui tam in this sense was necessarily a case or controversy, so is qui tam in the very different sense proposed by the Solicitor

---

[12] This historical argument concerns the status of qui tam actions as cases or controversies We discuss below, *see infra*, at pp. 232-38, the broader claim that history validates qui tam whether or not it can be accommodated to any particular constitutional principle, such as the requirements of Article III

227

General, in which a relator who has not been injured sues for himself, not the government.

Next, it is far from clear that the Framers, had they examined the matter, would have concluded that qui tam as they knew it satisfied the case or controversy requirement. There is certainly no direct evidence that they thought so. Indeed, qui tam statutes that permitted an uninjured informer to sue, and actions brought by such informers, apparently were both fairly rare. Many statutes seem to have contemplated — and almost all suits actually brought seem to have been — actions either by public officials or injured parties.[13] Qui tam actions brought by pure informers thus probably would not have seemed a commonplace thing for the Framers, and we cannot assume that they would have thought that Article III had to bend to such actions.

Finally, the argument that anything that could go into court in 1787 must be a case or controversy has unacceptable consequences. At common law, the writs of prohibition, certiorari, quo warranto, and mandamus all were available to "strangers" who had no personal interest or injury in fact. *See, e.g.*, Raoul Berger, *Standing to Sue in Public Actions: Is it a Constitutional Requirement?* 78 Yale L.J. 816, 819-25 (1969); Louis L. Jaffe, *Standing to Secure Judicial Review: Public Actions*, 74 Harv. L. Rev. 1265, 1269-71 (1961). But both mandamus and quo warranto are actions brought to challenge the conduct of government officials. Under the Solicitor General's regime, any person could use these writs to challenge or compel government action wholly unrelated to the person using the writ. The implications of this position are staggering.

In any event, the Solicitor General's historical argument proves too much. If this view were accepted, it would mean that Congress could create universal standing simply by attaching a penalty to the violation of any law and offering any person who sues a right to share in the proceeds. This would privatize the Executive power, allowing any private person to enforce the law against any other, while opening up the decisions by the Executive to unprecedented interference. For example, Congress could enforce its restrictions on the President's conduct of foreign policy (such as the Boland Amendment) through qui tam actions. All executive actions would be subject to judicial review at the instance of any intermeddler, and the limits on the federal judicial power would be set by Congress, not the Constitution.

## C. Encroachment on Executive Powers

The President's power to execute the laws includes two aspects of

---

[13] We are aware of only one statistical survey of qui tam actions in America. That survey reflects that on the eve of the Revolution, of 70 informer suits brought under the navigation laws, 67 were brought by government officials, and only 1 was brought by an informer who appeared to have no injury of his own to redress. Lawrence A. Harper, *The English Navigation Laws* 170 (1939).

authority that are important here: the discretion to decide whether to prosecute a claim, and the control of litigation brought to enforce the government's interests. The qui tam provisions infringe on both. First, the provisions permit a private citizen to sue on behalf of the government, even though the Attorney General may have decided for legitimate reasons not to prosecute the claim. This power removes from the executive branch the prosecutorial discretion that is at the heart of the President's power to execute the laws. Second, the qui tam provisions vest in the relator a voice in crucial litigation decisions, even if the Attorney General decides to enter the suit. The Attorney General may not move to dismiss the suit, settle the action, or restrict the relator's participation except by permission of the court. *See* 31 U.S.C. § 3730(c). The court also decides whether discovery may be stayed to prevent interference with ongoing civil or criminal investigations. *Id.* These provisions vest core executive power in the judicial branch. Moreover, in suits in which the Attorney General declines to participate, the relator exercises full sway over the course of the government's litigation interests. The Attorney General can neither remove the relator from his "office" nor instruct him how to represent the government's interests.

This transfer by Congress of executive power away from the President to the relator and the court is impermissible even under the Supreme Court's most lenient standard for judging threats to separation of powers. In *Morrison v. Olson*, the Court held that restrictions on the Executive's power to supervise and remove an independent counsel did not violate separation of powers principles, but only because the Attorney General retained "sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties." 487 U.S. at 696. In upholding the independent counsel statute, the Court stressed four aspects of executive control. First, the Attorney General has control over initiation of prosecutions because he retains the "unreviewable discretion" to decline to request the appointment of an independent counsel. *See id.* at 695-96. Second, the Attorney General controls the breadth of the independent counsel's investigation because it is he who provides the statement of facts upon which the special court sets the counsel's jurisdiction. Third, the Attorney General retains the power to remove the independent counsel for "good cause" and thus has "ample authority" to ensure that the counsel is properly fulfilling his duties. *Id.* at 696. Fourth, the Act expressly requires that, once appointed, the independent counsel must comply with Justice Department policy unless it would be impossible to do so. *See id.*

The Court's analysis in *Morrison* highlights the unconstitutionality of the qui tam provisions. In contrast to the independent counsel statute, under the qui tam provisions the Attorney General loses all control over the decision whether to initiate a suit. Even where the Attorney General determines that initiating a suit is not warranted, the qui tam relator is

229

empowered to override his judgment and initiate the fraud action. When the Attorney General concludes that proceeding with a suit is not merited or otherwise not in the United States' interests, the fraud action nevertheless goes forward in the government's name, under the complete control of the self-interested relator. The Attorney General has no control over the breadth of the suit. He has no power to remove the relator no matter how irresponsible his suit becomes. He has no power to require the relator to adhere to the rules and policies of the Department of Justice, despite the fact that the relator is suing in the name of the United States.[14]

Further, if the Attorney General does not enter the suit within the first sixty days, his ability later to assert the interests of the United States are sharply curtailed. He cannot intervene unless he persuades the court that "good cause" exists. Even then, the private relator still has "the right to conduct the action," and the court may not "limit[] [his] status and rights." 31 U.S.C. § 3730(c)(3). Moreover, even where the Attorney General does enter the case during the first sixty days, he does not have the right to take over the litigation. The relator remains a full party entitled to participate in the case. Through his own conduct of the case, the relator effectively can overrule litigation decisions made by the Attorney General, and he is specifically empowered to challenge any effort by the government to settle or dismiss the suit. When a dispute arises between the Attorney General and the relator, the ultimate decision is left to the discretion of the court.

There is another fundamental difference between the qui tam provisions and the independent counsel statute. The independent counsel device was intended to address a narrow structural problem — the perceived conflict of interest when the Attorney General is called upon to investigate criminal wrongdoing by his close colleagues within the executive branch. The Court accepted the independent counsel device as an appropriate means of dealing with this intrabranch conflict. The device arguably does not unduly encroach on executive power because its very purpose is to investigate impermissible executive activity. Moreover, the device is narrowly tailored to achieve its purpose; it encroaches on the Executive only to the limited extent necessary to protect against a conflict of interest, while retaining executive control consistent with that objective.

Both the premise of the qui tam provisions and the means Congress has used to advance its goals are far more threatening to the executive branch. The legislative history of the 1986 Amendments shows that Congress was acting out of generalized distrust of, and dissatisfaction with, the way the executive branch was carrying out its law enforcement responsibilities. Senator Grassley felt that "the Government bureaucracy [was] ... unwilling to guard against or aggressively punish fraud." 131 Cong. Rec. 22,322 (1985). Representative Berman was equally candid:

---

[14] *See* the general discussion of the statute's provisions, *supra* pp. 215-17.

he supported qui tam because he thought that "the Department of Justice has not done an acceptable job of prosecuting defense contractor fraud." 132 Cong. Rec. 22,339 (1986). Later in the debate, he explained that the relator was being given full party status at trial "to keep pressure on the Government to pursue the case in a diligent fashion." 132 Cong. Rec. 29,322 (1986).[15]

The history of qui tam thus confirms that it is not a narrowly focused measure designed to cure a structural defect within the executive branch. Rather, Congress is simply attempting to substitute its judgment on how to execute the laws for that of the President. More narrowly tailored means are available to fulfill the legitimate purpose of enhancing enforcement of procurement fraud cases. Congress could provide greater resources and, to the extent it wanted to encourage informers, could provide for simple bounties for their information without giving them the authority to conduct the litigation.

In contrast, permitting Congress to choose its own private law enforcers violates separation of powers and establishes a basis for governance by tyranny. As Madison recognized, the legislative branch is the most powerful, and hence, potentially the most dangerous to the separation of powers, because

> it can with the greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments. It is not unfrequently a question of real-nicety in legislative bodies, whether the operation of a particular measure, will, or will not extend beyond the legislative sphere.

*The Federalist No. 48*, at 334 (James Madison) (Jacob E. Cooke ed. 1961). No question of "real-nicety" is involved here — in the qui tam provisions, Congress has extended its power far beyond the legislative sphere. Where, as here, Congress has provided for its law to be enforced by its own deputies, the essence of separation of powers has been violated, for "'[w]hen the legislative and executive powers are united in the same person or body,'... 'there can be no liberty, because apprehensions may arise lest the same monarch or senate should *enact* tyrannical laws, to *execute* them in a tyrannical manner.'" *The Federalist No. 47*, at 326 (James Madison) (Jacob E. Cooke ed. 1961) (quoting Montesquieu).

Contrary to the Solicitor General's view, the Attorney General's right to

---

[15] The legislators who supported the 1986 Amendments were echoing those who, in 1943, defeated repeal of the False Claims Act's qui tam provisions An opponent of qui tam, Senator Van Nuys, asked one of its friends, Senator Murray, whether he had "sufficient confidence in the man who is a member of the President's Cabinet, the Attorney General, to believe that he will conserve the best interests of the public?" Senator Murray replied that "[w]e have found that that cannot always be relied upon." 89 Cong. Rec 7575 (1943)

intervene and take over the case does not save the statute from violating separation of powers principles. The statute enables a private party with only a mercenary interest in a case to force a suit to be brought, even though the Attorney General already may have decided for legitimate policy reasons not to prosecute. The Supreme Court has recognized that the Executive has the exclusive authority to decide whether to prosecute a case, *United States v. Nixon*, 418 U.S. 683, 693 (1974), because only a unitary executive properly can balance the competing interests at stake, including law enforcement, foreign affairs, national security, and the overriding interest in just administration of the laws.

## IV. HISTORY DOES NOT VALIDATE QUI TAM

In the face of qui tam's admittedly "grave dangers" to the President, the Solicitor General is prepared to disregard settled constitutional doctrine and decades of clear Supreme Court decisions in order to uphold the facial validity of qui tam. He claims this fateful step is compelled by qui tam's historical usage.[16] In fact, the historical argument is subject to decisive objections.

To begin with, the entire historical inquiry is essentially pointless, since the version of qui tam that the Solicitor General proposes to defend differs essentially from qui tam as it existed in history. Whatever else may have been true of it, historical qui tam was a proceeding in which the relator sued on behalf of the government, and once the suit was brought, there was no provision for government intervention. The Solicitor General recognizes that this violates the Appointments Clause and would substitute for it a new regime under which the relator sues on his own behalf and the government is entitled to enter the case. History does not contain that regime, and therefore cannot be invoked to support it.

Moreover, the historical argument fails on its own terms. We agree with the Solicitor General that certain kinds of constitutional questions will be influenced by certain kinds of historical practices. But an examination of the Supreme Court's use of history demonstrates, not that history invariably prevails, but that *close questions where the application of principle is unclear can be resolved by thoroughly considered, long-standing historical practices that can be reconciled with doctrine.* The constitutionality of qui tam, however, is not a close question, and the use of qui tam, far from being ingrained in our legal institutions, has been marginal at most. History cannot save qui tam.

First, usage alone — regardless how longstanding and venerable — cannot validate a practice that clearly violates constitutional principles.[17]

---

[16] That usage, which we discuss more fully below, consists of the existence of qui tam in England and the enactment by early Congresses of a few qui tam provisions

[17] *See, e.g., Walz v Tax Comm'n*, 397 U.S. 664, 678 (1970) ("It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it.").

The Constitution, not history, is the supreme law. The Court repeatedly has stated that "[s]tanding alone, historical [practice] cannot justify contemporary [constitutional] violations," *Marsh v. Chambers*, 463 U.S. at 790, even when the practice "covers our entire national existence and indeed predates it." *Walz v. Tax Comm'n*, 397 U.S. at 678.

Qui tam is fundamentally irreconcilable with the doctrine of standing under Article III and the President's appointment powers and law enforcement functions under Article II. This is a case where, absent the invocation of history, there would be no question about the practice's unconstitutionality. The mere fact that the earliest congresses adopted a practice has never been enough to establish conclusively the practice's constitutionality. Indeed, *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), struck down part of the Judiciary Act of 1789, a statute adopted by the First Congress. There are other examples of actions taken by the First Congress that later became viewed as unconstitutional. *See, e.g., Wallace v. Jaffree*, 472 U.S. 38, 100 (1985) (Rehnquist, J., dissenting) (federal aid to sectarian schools viewed as unconstitutional despite grants of such aid by First Congress); *INS v. Chadha*, 462 U.S. 919, 982-84 n.18 (1983) White, J., dissenting) (use by First Congress of precursors to legislative veto held unconstitutional); *Hayburn's Case*, 2 U.S. (2 Dall.) 409 (1792) (declining to enforce First Congress statute giving courts non-judicial duties). *Cf. New York Times Co. v. Sullivan*, 376 U.S. 254, 276 (1964) ("broad consensus" that Sedition Act of 1798 was unconstitutional); Paul M. Bator, *et. al., Hart & Wechsler's The Federal Courts and the Federal System* 65-67 (3d ed. 1988) (describing request by Thomas Jefferson for Supreme Court advisory opinions that was rejected as unconstitutional). Likewise, the same Congress that proposed the Fourteenth Amendment adopted a statute one week later reaffirming racial segregation of public schools in Washington, D.C. *See Marsh v. Chambers*, 463 U.S. at 814 n.30 (Brennan, J., dissenting).

Given qui tam's basic conflict with the Constitution, we believe any argument to sustain qui tam based solely on prior practice must fail. We are unaware of a single Supreme Court case that has upheld a past practice that could not be reconciled with principle. On the contrary, the Supreme Court has recognized that long-standing practice does not insulate even its own errors from correction.[18]

Historical practice *can* influence close cases where the implications of principle are not clear. In such close cases, the authority of a practice depends mainly on three factors: (1) whether there is evidence the Framers actually considered the constitutional implications of their

---

[18] *See, e g., Shaffer v. Heitner*, 433 U.S. 186 (1977) (overruling *Pennoyer v. Neff*, 95 U.S 714 (1878)); *Brown v Board of Educ*, 347 U.S. 483 (1954) (overruling *Plessy v. Ferguson*, 163 U.S. 537 (1896)); *Graves v. New York ex ref. O'Keefe*, 306 U.S 466 (1939) (overruling *Dobbins v Erie County*, 41 U.S. (16 Pet.) 435 (1842)), *Erie R R v Tompkins*, 304 U S 64 (1938) (overruling *Swift v. Tyson*, 41 U S (16 Pet.) 1 (1842)).

actions; (2) whether the practice is so longstanding and pervasive that it has become "part of the fabric of society;" and (3) whether the practice can be reconciled with constitutional principles in a way that does not undermine settled doctrine. *See, e.g., Young v. United States ex rel. Vuitton et Fils S.A.; Marsh v. Chambers; Walz v. Tax Comm'n.* Even if the constitutionality of qui tam were a close question, however, the statute could not satisfy these three factors.

As to the first factor, the Court noted in *Marsh v. Chambers* that the weight to be accorded the actions of the First Congress depends on the extent to which the members actually reflected upon how the provisions of the new Constitution applied to the actions they were taking. "[E]vidence of opposition to a measure ... infuses [the historical argument] with power by demonstrating that the subject was considered carefully and the action not taken thoughtlessly, by force of long tradition and without regard to the problems posed" by principles embodied in the new Constitution. 463 U.S. at 791.

Early qui tam statutes have all the hallmarks of action "thoughtlessly" taken. As far as we are aware, the historical record shows *no evidence* that qui tam's constitutional implications were discussed or considered. On the contrary, because of the unique historical contexts in which qui tam statutes were adopted, the device's incompatibility with executive law enforcement functions would not have been immediately apparent. Qui tam simply did not bite hard enough for the Executive to recognize or resist it as a usurpation of its authority. Moreover, we know that members of the First Congress held erroneous assumptions about the extent to which, under the Constitution, English common law and its institutions had been carried over to the federal level of the United States.[19] The First Congress's early use of qui tam appears to have been nothing more than a manifestation of this initial confusion.

As to the second factor, the Court has relied on history to resolve borderline cases when the practice has been so pervasive as to become "part of the fabric of our society." *Id.* at 792. A brief survey of the history of qui tam demonstrates that it is a marginal practice that could be eliminated without leaving a trace.

---

[19] For the first six years after the Constitution was adopted, virtually all persons who considered the issue believed that the Constitution permitted a federal common law of crimes. *See* Stewart Jay, *Origins of Federal Common Law Part One*, 133 U Pa L Rev 1003 (1985). The Framers presumably believed this because it was a practice with which they were familiar at common law in Britain and in the states. The federal common law of crimes was challenged only after a political dispute arose between the Federalist and Republican parties, which led the Republicans to begin to appreciate that the federal common law of crimes was inconsistent with the new Constitution's vesting of the legislative power solely in Congress Thomas Jefferson, who had approved a common law prosecution, became a vigorous advocate of the view that such prosecutions were unconstitutional Today, this is the conventional view of the matter. Indeed, it is worth noting that common law crimes and qui tam involve complementary errors: criminal common law is inconsistent with Congress's legislative power, while qui tam is inconsistent with the President's executive power. Both of those exclusive vestings of power were innovations introduced by the Constitution, the full implications of which were only slowly perceived

In name, qui tam originated at common law, but common law qui tam — which disappeared as early as the 14th century — required *injury in fact. See* Washington University Note, at 83-86. An aggrieved party sought to gain access to royal courts by arguing that the private injury he had sustained also was an affront to the king. By the end of the 14th century, the royal courts were hearing suits without the fiction of qui tam, and the device faded. *See id.* at 85. Common law qui tam thus supports the Solicitor General's position only if turned on its head: at common law, the actual injury was to the plaintiff, and it was a legal fiction that injury was also done the king; under the False Claims Act, the real injury is to the government, and the Solicitor General urges upon us the fiction that it is the private plaintiff who has a viable cause of action.

After the 14th century, qui tam became a creature of statute, under which injury in fact was often required. *See* Washington University Note, at 86. Some statutes, however, permitted private informers, regardless of injury, to prosecute a wrongdoer for violation of a penal law. Although the statutes of Parliament have only tangential bearing on the validity of a practice under our new Constitution, it nevertheless is noteworthy that even in England, qui tam proved a vexatious device that ultimately could not be reconciled with the institutions of free and responsible government. As in the early days of our Republic, statutory qui tam served a necessary expedient for a medieval English Government that did not yet have the machinery for effective local law enforcement.

Part of the decline of qui tam may be attributed to its history of abuse. One commentator noted that the device was used "as means to gratify ill will. Litigation was stirred up simply in order that the informer might compound for a sum of money. Threats to sue were an easy means of levying blackmail." 4 Holdsworth, *A History of English Law* 356 (1924). Lord Coke classed informers as "viperous vermin." He contended that "the king cannot commit the sword of his justice or the oil of his mercy concerning any penal statute to any subject." *See* Gerald Hurst, *"Common Informers,"* 147 Contemp. Rev. 189-90 (1935). From the 16th century forward, the history of qui tam is one of retreat, as Parliament progressively restricted and curtailed its use. It ultimately was abolished there in 1951. *See* Washington University Note, at 83-88.

On this side of the Atlantic, qui tam never really gained a secure foothold, particularly at the federal level. It appears that six qui tam statutes, restricted to narrow enforcement areas, were enacted during the first four congresses. Adopted when the Executive was embryonic, these statutes were essentially stop-gap measures, confined to narrow circumstances where the Executive lacked the resources to enforce the law. Their intent was to assist a fledgling Executive, not supplant it. As the Executive's law enforcement capabilities gathered strength, qui tam rapidly fell into disfavor. Within a decade, "the tide had ... turn[ed]

235

against" qui tam, and Congress started curtailing its use. Leonard D. White, *The Federalists* 417 (1956).

The only other appreciable use of qui tam came during the Nation's greatest emergency, the Civil War. The unprecedented explosion in federal procurement, coupled with the extreme demands of war, prompted enactment of the False Claims Act. Following the war, qui tam again became dormant. By 1986, except for a flurry of activity during World War II, qui tam had become an anachronism.[20] We think a fair survey of the history of qui tam in the United States reveals it as, at best, a marginal and transitory device that never achieved prominence within our constitutional system because it was so fundamentally incompatible with that system.

Nor does the practice of qui tam meet the third criterion, under which the Court may uphold a practice that can be accommodated as a narrow and self-contained exception that does not threaten to undermine important constitutional principles. *See e.g., Young v. ref. Vuitton et Fils S.A..* But qui tam is not capable of being contained as a narrow exception, restricted in a principled manner to its limited historic scope.[21] Qui tam's principle of private law enforcement is so fundamentally incompatible with the established doctrines of standing and separation of powers that if qui tam were accepted, these doctrines would be drained of any meaning. Qui tam is, by its nature, an exception that will consume the rule.

Qui tam thus does not have any of the characteristics that have led the Supreme Court to give an historical practice the benefit of the doubt in a close case. Moreover, there are two considerations specific to qui tam that reduce the authority of its historical pedigree. First, where separation of powers issues are at stake, we do not think it is appropriate to give prior *congressional* action dispositive weight in determining the constitutional-

---

[20] For example, we are aware of only one case in this century under the qui tam provisions that apply to the Indian trade, and that was brought by a relator who had been personally injured. *See United States ex ref. Chase v. Wald*, 557 F 2d 157 (8th Cir.), *cert denied*, 434 U.S. 1002 (1977). Similarly, we are aware of only one 20th century action brought under the qui tam provision of the postal laws, which nominally remained in force until the creation of the Postal Service in 1970. In that case, the Eighth Circuit held that the statute did not provide a private right of action for the informer. *Williams v. Wells Fargo & Co Express*, 177 F 352 (8th Cir. 1910). However, passage of the 1986 Amendments significantly increased awards and subsequently has resulted in a substantial increase in the number of qui tam suits.

[21] If we find that the historical practice of qui tam is per se constitutional because of its pedigree, then we must accept the entire practice as it actually existed, not merely those aspects of it that seem least objectionable to modern sensibilities. This would raise the possibility of criminal prosecutions by private persons, especially given that in England criminal qui tam was well known. *See* Washington University Note, at 87-89 In the United States, the penalty provision of the first Census Act, which authorized qui tam enforcement, allowed the penalty to be collected through an action in debt or by indictment or information — the latter two implying a criminal proceeding. Act of Mar. 1, 1790, ch. 2, § 3, 1 Stat. 101, 102. Moreover, some of the early qui tam statutes, including the first Census Act, authorized private persons who had not been injured to sue public officials in qui tam to collect penalties for the officials' failure to perform their duty. *Id* We could tolerate neither private criminal prosecution nor the general privatization of executive branch employee discipline. But if we conclude that we cannot accept some part of the historical practice, there is no reason to defend the remainder under the theory that history is necessarily correct

236

ity of a later statute. Congress's aggrandizing enactments should not serve as conclusive precedent on the scope of Congress's own authority. The Framers recognized that, in a mixed government, it is the legislative body — the "impetuous vortex" — that is the branch most disposed to usurp the powers of the others. They also warned that "[the legislative department] can with the greater facility, mask under complicated and indirect measures, the encroachments which it makes on the coordinate departments." *The Federalist No. 48*, at 334 (James Madison) (Jacob E. Cooke ed. 1961). It is true that many of the members of the early congresses had been involved in framing the Constitution. We cannot assume for that reason, however, that as congressmen they were above attempted encroachments on the other branches. Their actions are not sacrosanct and should be subject to careful examination for "masked" encroachments on co-ordinate branches. Our obligation to the Constitution requires that we adhere to the principles the Framers wrote into that document, not to the Framers' misapplications of those principles.[22]

Longstanding congressional practice gains somewhat more precedential value where accompanied by equally longstanding ratification by one or both of the other branches. But ratification requires more than unthinking acquiescence — it requires an informed and deliberate judgment that a particular practice is constitutional. Early Executive acquiescence to qui tam is easily explained. As suggested above, because of the unique historical context in which qui tam was adopted, its incompatibility with our constitutional framework was not immediately evident. An expedient measure — even one undergirded by a noxious principle — may, in a particular historical setting, appear benign and at first be welcomed without question because of its apparent functionality. It is only through experience, as the measure is applied through a range of circumstances, that the pernicious principle reveals itself and becomes fully understood. There is no doubt that the First Congress resorted, sparingly, to the expedient measure of qui tam. But we doubt the Framers or the First President would have embraced the underlying principle had they considered and fully understood its implications.

---

[22] Genuine separation of powers, with three truly distinct and independent branches of government under a written constitution, was very new in 1789. It is therefore not surprising that early congresses enacted a number of measures that would today strike us as plainly unconstitutional. For example, the courts were given a number of non-judicial powers and duties, including the removal of U.S Marshals, who then as now were appointed by the President. Act of Sept. 24, 1789, ch 20, § 27, 1 Stat 72, 87 The First Congress also directed federal judges to substitute for French consuls in investigating shipwrecks of French vessels, Act of Apr 14, 1792, ch. 24, § 1, 1 Stat. 254, and to make reports to the Secretary of the Treasury on customs forfeitures, Act of May 26, 1790, ch 12, 1 Stat. at 122-23. *See generally* Russell Wheeler, *Extrajudicial Activities of the Early Supreme Court*, 1973 Sup. Ct. Rev 123. Moreover, early congresses followed the colonial practice of treating the Secretary of the Treasury as if he were as much their officer as the President's, requiring that he prepare reports at the request of either House. Act of Sept 2, 1789, ch. 12, § 2, 1 Stat 65-66. This provision survives as 31 U S.C. § 331(d), which appears to be a clear violation of *INS v. Chadha*, 462 U.S. 919 (1983)

Second, we think a strong case can be made that *Morrison v. Olson* sharply undercuts any historical argument for qui tam. *Morrison* judges a practice's constitutionality by the *degree* to which the practice *actually interferes* with the Executive's functions. *See* 487 U.S. at 685-97. Under this balancing test, the early qui tam statutes arguably may have passed constitutional muster, while Congress's 1986 use of qui tam clearly does not. Early qui tam statutes involved little or no actual interference with the Executive. For practical purposes, they were confined to circumstances where the Executive's capacity to enforce the law was virtually non-existent — either because, as in the case of the 18th century statutes, the Executive was embryonic, or, as in the case of the Civil War statute, the Executive was overwhelmed and otherwise occupied. Those statutes were designed to aid, not supplant, the Executive. They reflect no ambition to control or override the Executive's official law enforcement activities. Prompted by necessity, they fell into disuse once necessity abated.

In contrast, the 1986 Amendments substantially interfere with the Executive's functions. The executive branch today is fully capable of policing claims against the government.[23] Indeed, procurement is now one of the most heavily regulated and policed sectors of public activity. In resuscitating the dormant qui tam device, Congress's express purpose was to interfere with the Executive's law enforcement activities, to displace official prosecutorial discretion with the mercenary motives of private bounty hunters. The narrow use of qui tam in the 18th century cannot validate the kind of encroachment qui tam causes today.

## V. THE SOLICITOR GENERAL'S UNWISE STRATEGY

The Solicitor General's approach declines to face squarely the constitutional questions raised by the qui tam statute. Rather, it adopts the tactic of arguing that the statute is facially constitutional and constitutional as it has been applied so far, but reserving the right to argue a violation of separation of powers based on a balancing of interests if additional encroachment on the Executive's powers subsequently occurs. This approach employs both bad tactics and bad law.

First, the approach is tactically unwise because it forces us to forfeit the strongest objective arguments in favor of protecting executive branch interests. The Solicitor General advocates total relinquishment of the standing and Appointments Clause arguments; yet, as discussed above, under existing case law these arguments point clearly toward a conclusion that the statute is unconstitutional. Once those are abandoned, all that will remain to protect the President's interests will be the argument

---

[23] Even assuming the Executive lacks sufficient resources to investigate and prosecute such claims, there are other ways Congress can address the problem that would be constitutional, such as funding more Department of Justice resources targeted at those claims.

that at some undefined point, the subjective degree of encroachment on executive powers will have become unbearable. That sort of unprincipled balancing approach leaves the Executive entirely vulnerable to an adverse judicial decision.

Moreover, conceding standing itself weakens the separation of powers argument. To satisfy the standing requirements, we must accept the fiction that the relator and the Executive are coplaintiffs pursuing two separate claims. With that fiction in place, the encroachment on executive powers is difficult to resist, since the issue becomes framed in terms of the competing interests of two litigants rather than an infringement on separation of powers.

Second, the approach represents a completely disingenuous way of determining a statute's constitutionality. Although it is generally true that a statute should be construed when possible to avoid constitutional problems, portions of the statute cannot be twisted or ignored to reach that result. The Court recently reaffirmed the longstanding principle that in assessing the facial validity of a statute, it will not "'press statutory construction "to the point of disingenuous evasion" even to avoid a constitutional question.'" *Public Citizen v. United States Department of Justice*, 491 U.S. at 467 (quoting *United States v. Locke*, 471 U.S. 84, 96 (1985) (quoting *Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379 (1933))). *Accord Webster v. Reproductive Health Servs.*, 492 U.S. 490 (1989) (reprimanding the plurality for "distorting the statute" to avoid invalidating it) (Blackmun, J., dissenting). Even the Solicitor General concedes that some provisions of the qui tam statute are facially unconstitutional, such as the grant to the court of the ultimate power to decide whether the government may settle or dismiss a qui tam suit when the relator objects. *See* Taranto Memo at 12. To argue, then, that these provisions must be ignored for now and later applied other than as written to avoid an as-applied challenge engages in the very sort of "disingenuous evasion" against which the Court has cautioned. Moreover, by conceding that the statute is constitutional as applied to date, the Solicitor General concedes the legality of the prime example of encroachment on executive powers — the Executive's ability to initiate suit and the discretion to decide which cases not to pursue.

Third, the Solicitor General's proposed balancing approach does not properly apply *Morrison v. Olson*. The Solicitor General advocates examining each case brought under the qui tam statute to ascertain the degree of that case's encroachment on executive powers. This method of analysis is completely inconsistent with the balancing approach used in *Morrison*, which looked instead at the potential impact of applying the statute according to its terms.

The Solicitor General also advocates a more global approach to analyzing the potential encroachment on executive powers. Under this approach, the Solicitor General recommends waiting to see if Congress

239

employs the qui tam method of enforcement in other statutory contexts. If so, the Solicitor General postulates that the cumulative burden on executive powers might be so great that the amendments to the False Claims Act then would be unconstitutional. This method of analysis has no basis in law. The Court has never determined the constitutionality of a statute based on the effect of other statutes. Moreover, there is no principled way to determine how many such statutes must be enacted before the encroachment achieves constitutional proportions.

Finally, the Solicitor General's piecemeal approach fundamentally conflicts with his historical argument. The Solicitor General contends in part that qui tam must be upheld because its historical acceptance by courts and Congress since this country's inception has been "ancient, regular, and unbroken." Taranto Memo at 4. In particular, the Solicitor General has pointed to the favorable treatment given an earlier version of the False Claims Act qui tam provisions in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943). That version of the Act, however, did not contain the provisions introduced by the 1986 Amendments granting the court the ultimate authority to dismiss or settle a qui tam action in which the government has intervened. The Solicitor General acknowledges that his view of the statute's constitutionality ultimately depends upon a proper application of those provisions. *See* Taranto Memo at 12. The Solicitor General cannot consistently claim both that qui tam has historical constitutionality and that the current statute's validity rests on the proper application of provisions introduced in 1986. The two arguments cannot and do not coexist.

## VI. CONCLUSION

For these reasons we recommend that you authorize the Civil Division to enter an appropriate case and present the executive branch's arguments against the constitutionality of qui tam.

WILLIAM P. BARR
*Assistant Attorney General*
*Office of Legal Counsel*

240